No. 22-4407

# United States Court of Appeals for the Fourth Circuit

_____

**UNITED STATES OF AMERICA,**
*Appellee,*

**v.**

**DASHAWN LEONARD GARRETT,**
*Appellant.*

_____

*On Appeal from the United States District Court
for the Eastern District of North Carolina*

## RESPONSE BRIEF OF THE UNITED STATES

MICHAEL F. EASLEY, JR.
*United States Attorney*

BY:   DAVID A. BRAGDON
KRISTINE L. FRITZ
*Assistant United States Attorneys*

150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601
Telephone: (919) 856-4530

*Attorneys for Appellee*

# TABLE OF CONTENTS

Table of Authorities ................................................................... iii

Statement of Jurisdiction ............................................................. 1

Introduction .......................................................................... 2

Statement of Issues ................................................................... 4

Statement of Facts ................................................................... 5

Summary of Argument ............................................................... 22

Argument ........................................................................... 25

**I.    Garrett has not shown that his guilty pleas were unknowing and involuntary.**

    A.    Standard of Review .................................................. 25

    B.    Discussion of Issue .................................................. 26

        1.    A guilty plea entered with knowledge of its direct consequences will be set aside as involuntary only in narrow circumstances ...................... 26

        2.    Garrett has not demonstrated egregiously impermissible government conduct as required by *Fisher* ....................................................... 29

        3.    Garrett has not shown that shortcomings in the Cole-Evans PRTT induced his guilty plea ........................ 33

        4.    Garrett has not shown that that timing of the February 2, 2022, disclosures rendered his guilty plea involuntary ............................................. 37

        5.    Garrett and Cole-Evans were not similarly situated ......................................................... 39

i

**II.    Garrett waived the right to appeal his sentence.**

A.    Standard of Review ................................................... 40

B.    Discussion of Issue ................................................... 40

Conclusion ................................................................. 44

Certificate of Compliance

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Brady v. Maryland,*
    373 U.S. 83 (1963) ............................................................. 23, 37–39

*Brady v. United States,*
    397 U.S. 742 (1970)............................................................26, 27

*Carpenter v. United States,*
    138 S. Ct. 2206 (2018)............................................................. 31

*Ferrara v. United States,*
    456 F.3d 278 (1st Cir. 2006) ................................................... 27

*Franks v. Delaware,*
    438 U.S. 154 (1978)........................................................ passim

*Hill v. Lockhart,*
    474 U.S. 52 (1985) ................................................................. 26

*Jones v. Cooper,*
    311 F.3d 306 (4th Cir. 2002) ................................................... 38

*Lassiter v. Turner,*
    423 F.2d 897 (4th Cir. 1970) ................................................... 29

*North Carolina v. Alford,*
    400 U.S. 25 (1970) ................................................................. 26

*Puckett v. United States,*
    556 U.S. 129 (2009)................................................................ 25

*United States v. Blick,*
    408 F.3d 162 (4th Cir. 2005) ................................................... 42

*United States v. Boutcher,*
    998 F.3d 603 (4th Cir. 2021) ................................................... 40

*United States v. Cohen,*
   459 F.3d 490 (4th Cir. 2006) ................................................................... 41

*United States v. Dominguez Benitez,*
   542 U.S. 74 (2004) ................................................................................... 25

*United States v. Fisher,*
   711 F.3d 460 (4th Cir. 2013) ........................................................... passim

*United States v. General,*
   278 F.3d 389 (4th Cir. 2002) ................................................................... 41

*United States v. Lockhart,*
   947 F.3d 187 (2020) (en banc) ................................................................ 25

*United States v. Massenburg,*
   564 F.3d 337 (4th Cir. 2009) ................................................................... 25

*United States v. McCoy,*
   895 F.3d 358 (4th Cir. 2018) .............................................................25, 41

*United States v. Moussaoui,*
   591 F.3d 263 (4th Cir. 2010) ................................................................... 38

*United States v. Olano,*
   507 U.S. 725 (1993) ............................................................................25, 37

*United States v. Payner,*
   447 U.S. 727 (1980) ................................................................................. 31

*United States v. Roberson,*
   No. 21-4128, 2023 WL 2064581
   (4th Cir. Feb. 17, 2023) (unpublished) ..............................................42–43

*United States v. Ruiz,*
   536 U.S. 622 (2002) ............................................................................27, 38

*United States v. Soloff,*
   993 F.3d 240 (4th Cir. 2021) ................................................................... 41

*United States v. Suggs,*
   No. 20-4032, 2022 WL 313845
   (4th Cir. Feb. 2, 2022) (unpublished) ........................................ 42

## Statutes

18 U.S.C. § 2 ......................................................................... 5

18 U.S.C. § 922(g)(1) .......................................................... 5–6

18 U.S.C. § 924 .................................................................. 5–6

18 U.S.C. § 924(c) ............................................................. 3, 35

18 U.S.C. § 924(c)(1)(A)(i) ...................................................... 6

18 U.S.C. § 3231 ................................................................... 1

18 U.S.C. § 3553 .................................................................. 43

18 U.S.C. § 3742 .................................................................. 17

18 U.S.C. § 3742(a) ................................................................ 1

21 U.S.C. § 841(a)(1) .......................................................... 5–6

21 U.S.C. § 846 .................................................................... 5

21 U.S.C. § 851 ............................................................ 6, 16, 18

28 U.S.C. § 1291 ................................................................... 1

28 U.S.C. § 2255 .............................................................. 17, 29

## Rules

Fed. R. Crim. P. 11 ............................................................... 41

Fed. R. Crim. P. 52(b) ........................................................ 25, 37

## Sentencing Guidelines

U.S.S.G. § 3E1.1(b) ........................................................................ 36

## STATEMENT OF JURISDICTION

Defendant Dashawn Leonard Garrett appeals from a judgment of conviction following a guilty plea. Jurisdiction to the district court was established by 18 U.S.C. § 3231.

Jurisdiction to this Court is provided by 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). The judgment was entered on July 19, 2022, and Garrett filed a timely notice of appeal the same day.

# **INTRODUCTION**

In October 2020, Dashawn Leonard Garrett possessed a firearm as a felon. In January 2021, he became the focus of a methamphetamine investigation. Investigators arranged controlled purchases with Garrett on February 3, 16, and 24 and March 8. They used a Wilson County Sheriff's Office confidential source (CS1) to make the first buy and a City of Wilson Police Department confidential source (CS2) for the subsequent deals. The first three were completed, and Garrett was arrested before the fourth.

After Garrett personally delivered the methamphetamine to CS1 on February 3, investigators obtained a pen register trap and trace order (PRTT) for the telephone ending -1711 that he used to make the deal (the Garrett PRTT).

Garrett could not meet CS2 on February 16, so he had his cousin Trevor Montae Cole-Evans make that delivery. Investigators obtained a PRTT for the telephone ending -8193 that Cole-Evans used to coordinate the exchange (the Cole-Evans PRTT). Unfortunately, the Cole-Evans PRTT did not distinguish between the actions of CS1 and CS2 or disclose whether CS2 was paid.

Garrett personally made the March 24 delivery.

Based on an agreement Garrett and CS2 reached on March 8 for nine ounces of methamphetamine, investigators anticipated that Garrett would meet with his supplier the following day. They were tracking his movements using the Garrett PRTT and a physical surveillance team when they realized from the Cole-Evans PRTT that the men were traveling together. A valid traffic stop led to a probable cause search of their car and the discovery of more

than ten ounces of methamphetamine. The warrant application for Garrett's home distinguished between the actions of CS1 and CS2, and the search of the home led to the discovery of firearms, controlled substances, and drug para-phernalia. On the day of his arrest, March 9, Garrett admitted that the contraband in the car and his bedroom was his.

Against this backdrop, and with the knowledge that his cell phone was being tracked, Garrett chose to plead guilty to the October 2020 firearm possession (Count Two), his delivery of methamphetamine on March 24, 2021 (Count Five), and his involvement in the drug-trafficking conspiracy (Count One) in exchange for concessions from the government, including the dismissal of a § 924(c) charge. This represented a voluntary and intelligent choice among the alternative courses of action available to him. In arguing otherwise, Garrett's opening brief fails to distinguish between the two PRTTs, makes no showing that the Garrett PRTT contained any misstatements or material omissions, incorrectly presumes Garrett has standing to challenge the Cole-Evans PRTT, and overstates the significance of the Cole-Evans PRTT in the case against him. The independent evidence against Garrett was overwhelming, and his guilty pleas should be upheld as knowing and voluntary.

His sentencing challenge should be dismissed as within the scope of the appellate waiver in his plea agreement.

## STATEMENT OF ISSUES

1.      Whether shortcomings in the Cole-Evans PRTT, which Garrett lacks standing to challenge, and which did not meaningfully affect the development of the case against him, provides a basis for vacating Garrett's guilty pleas to Counts One, Two, and Five under a plain-error standard of review.

If not, whether the disclosure of additional discovery materials about six weeks before Garrett's guilty pleas provides an independent basis to set aside his guilty pleas under a plain error standard of review.

2.      Whether Garrett waived his right to appeal his below-guidelines sentence in his plea agreement.

## STATEMENT OF FACTS

### Procedural History

On February 15, 2022, the grand jury in the Eastern District of North Carolina returned a nine-count superseding indictment against Dashawn Leonard Garrett, a/k/a "Dutch," and his cousin Trevor Montae Cole-Evans, charging them with:

| Ct. | Def. | Date | Offense |
|---|---|---|---|
| 1 | Garrett Cole-Evans | 1/2021–3/9/21 | Conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine, a Schedule II controlled substance (21 U.S.C. § 846) |
| 2 | Garrett | 10/30/20 | Possession of a firearm as a convicted felon (18 U.S.C. §§ 922(g)(1), 924) |
| 3 | Garrett | 2/3/21 | Distribution of a quantity of a mixture and substance containing a detectable amount of methamphetamine (21 U.S.C. § 841(a)(1)) |
| 4 | Garrett Cole-Evans | 2/16/21 | Distribution of 5 grams or more of methamphetamine and aiding and abetting (21 U.S.C. § 841(a)(1); 18 U.S.C. § 2) |
| 5 | Garrett | 2/24/21 | Distribution of 50 grams or more of methamphetamine (21 U.S.C. § 841(a)(1)) |
| 6 | Garrett Cole-Evans | 3/9/21 | Possession with intent to distribute 50 grams or more of methamphetamine and aiding and abetting (21 U.S.C. § 841(a)(1); 18 U.S.C. § 2) |
| 7 | Garrett | 3/9/21[1] | Possession with intent to distribute a quantity |

---

[1] Count Seven occurred at a time separate and apart from Count Six. J.A. 80.

| | | | of a mixture and substance containing a detectable amount of methamphetamine (21 U.S.C. § 841(a)(1)) |
|---|---|---|---|
| 8 | Garrett | 3/9/21 | Possession of a firearm in furtherance of a drug trafficking crime as charged in Count Seven (18 U.S.C. § 924(c)(1)(A)(i)) |
| 9 | Garrett | 3/9/21 | Possession of firearms as a convicted felon (18 U.S.C. §§ 922(g)(1), 924) |

J.A. 326–329; J.A. 346, ¶ 17. The superseding indictment alleged that Garrett committed the charged offenses after a prior conviction for a felony drug offense had become final. J.A. 329.

On February 22, 2022, the court denied Cole-Evans's motion to suppress. J.A. 213–216. On March 15, 2022, Garrett moved to withdraw his earlier filed motion to suppress because he intended to plead guilty with a plea agreement; the court granted his motion that day. J.A. 247–248, J.A. 251.

On March 16, 2022, the government filed a notice of intent to seek enhanced penalties under 21 U.S.C. § 851. J.A. 254–255. Additionally, Garrett pleaded guilty to Counts One, Two, and Five of the superseding indictment by plea agreement. J.A. 257–267; J.A. 332–340.

On July 11, 2022, the court concluded that Garrett was a career offender, calculated his advisory guidelines range to be 262 to 326 months' imprisonment, and sentenced him to a total of 240 months' imprisonment. J.A. 269–274. Garrett timely appealed. J.A. 283

On August 3, 2022—while Garrett's appeal was pending with this Court—Cole-Evans, through new counsel, asked the district court to reconsid-

er his motion to suppress and grant him a *Franks* hearing.  J.A. 285–291.  The government opposed the request, J.A. 293–307, and the court heard oral argument on the motion, S.A. 1–22.  The court granted the motion to reconsider and ordered a *Franks* hearing for its September 2022 term of court.  J.A. 309–313.  The hearing was continued at Cole-Evans's request because the parties were considering a negotiated resolution to his case.  *See* J.A. 314.  In October 2022, the government received leave of court to dismiss with prejudice Counts One, Four, and Six of the superseding indictment against Cole-Evans.  J.A. 318.

## Offense Conduct

*Count Two.*  On Halloween 2020, Selma Police Department officers operating a vehicle checkpoint stopped and searched an SUV that smelled of marijuana.  J.A. 263; J.A. 346, ¶ 16.  The sole back seat passenger was Garrett, and he admitted that the .22 caliber pistol found under his seat belonged to him and was "for protection."  J.A. 263; J.A. 346, ¶ 16.  Garrett acknowledged that he was a convicted felon, J.A. 263, having pleaded guilty in 2015 to 15 North Carolina drug-related felonies, J.A. 349, ¶¶ 29–30.

*Count One (Drug Conspiracy) and Remaining Counts.*  In early 2021, law enforcement began investigating Garrett, whom they mistakenly believed to be Gregory McDuffie, for distributing of large amounts of crystal methamphetamine in Wilson County and Johnston County.  J.A. 232; J.A. 346. ¶ 17.  According to investigative materials made part of the district court record, both

McDuffie and Garrett are validated Blood G-Shine members who occupied the same residence within a short period of time. J.A. 232. Both are black males between 5'11" and 6'1" with tattoos on their faces. J.A. 232. Additionally, the two CSs who interacted with Garrett only knew him by his street name. *See* J.A. 232. Officers recognized their mistake when they arrested Garrett on March 9, 2021, and soon thereafter issued an investigative report correcting the initial misidentification. J.A. 232. For simplicity, the government will refer to Garrett even when citing to investigative materials of record that refer to him as McDuffie.

In February and March 2021, four controlled purchases were arranged with Garrett. Three were completed and subject to audio/video recording and physical surveillance. Garrett was arrested after meeting a source of supply before the fourth could occur. The details of the arrangements are as follows:

**Count Three.** The Wilson County Sheriff's Office (WCSO) developed a confidential source (hereinafter "CS1")) who advised that he[2] could purchase an ounce of methamphetamine from Garrett for $860. J.A. 89. On the afternoon of February 3, 2021, officers established surveillance on Garrett's residence on South Pine Street in Princeton, North Carolina. J.A. 89. CS1 then placed a monitored phone call to Garrett at a phone number ending in -1711 to arrange the deal. J.A. 89. Law enforcement followed Garrett as he drove a sil-

---

[2] For convenience, the government will use masculine pronouns when referring to confidential sources.

ver Volvo sedan to a McDonald's parking lot where CS1 got into the Volvo to complete the transaction. J.A. 89–90. Less than an hour elapsed between CS1 placing his order and receiving approximately 34.7 grams of crystal methamphetamine from Garrett. J.A. 89–90; J.A. 346, ¶ 17.

Based on the information gathered during this controlled purchase, investigators obtained a pen register and trap and trace order for the mobile phone number ending -1711 associated with Garrett, which investigators referred to as Target Telephone 1 or TT1. *See* J.A. 89, J.A. 117, J.A. 238; *see also* J.A. 311–312 (recognizing that the first confidential source was relied upon in this application). The government will refer to this as the Garrett PRTT.

***Count Four.*** On February 16, 2021, a CS developed by the City of Wilson Police Department (CWP) (hereinafter "CS2") arranged to purchase an ounce of crystal methamphetamine and 8 ecstasy pills from Garrett for $850. *See* J.A. 92–93. Garrett told CS2 that his cousin would be making the exchange and gave CS2 his cousin's phone number ending in -8193. J.A. 93, J.A. 117, J.A. 346, ¶ 17. In a recorded call, CS2 used this phone number to arrange a meeting location. J.A. 117; *see* S.A. 13. Officers watching Garrett's residence observed Cole-Evans leave the home, get into a black Toyota hatchback, drive to a gas station, and then drive to meet CS2. *See* J.A. 92–93; S.A. 13. Cole-Evans got into CS2's vehicle, where CS2 exchanged the money for 28.28 grams of 100% pure crystal methamphetamine and 8 MDMA pills. J.A. 93; J.A. 346, ¶ 17; S.A. 13; *see* J.A. 151 (images of Cole-Evans captured during the transaction).

Shortly after the controlled purchase, WCSO Detective Massey obtained a state pen register and trap and trace order for the mobile phone number ending -8193 associated with Cole-Evans, which investigators referred to as Target Telephone 2 or TT2.  J.A. 116–122, S.A. 13–14; *see* J.A. 238.  The government will refer to this as the Cole-Evans PRTT.

The Cole-Evans PRTT did not distinguish between CS1 who was involved in the first controlled purchase and CS2 who was involved in the second controlled purchase.  *Compare* J.A. 117 (Cole-Evans PRTT), *with* J.A. 89–93, ¶¶ 1, 15, 21 (warrant for Garrett's residence); *see also* J.A. 311–312.

*Count Five.*  On February 24, 2021, CS2 arranged to buy four ounces of crystal methamphetamine from Garrett for $2,800.  J.A 94.  Physical surveillance established that Garrett was at his home briefly that afternoon before meeting CS2 in the parking lot of Parker's BBQ restaurant.  J.A. 94.  Investigators watched as Garrett arrived at the meeting spot in his Volvo, got into CS2's car, and completed the sale; CS2's audio/video recording device also captured an image of Garrett's face.  J.A. 94, J.A. 134.  In this transaction, Garrett sold CS2 110.44 grams of 100% pure crystal methamphetamine.  J.A. 346, ¶ 17.

*Count Six.*  On March 8, 2021, CS2 agreed to purchase nine ounces of crystal methamphetamine from Garrett for $6,000.  J.A. 346, ¶ 18; *see* J.A. 239.

The following morning, officers established physical surveillance around Garrett's residence in anticipation of him traveling to meet a drug supplier in Salisbury to pick up the crystal methamphetamine to sell to CS2.  J.A. 239.  At the residence, officers observed Garrett's Volvo (for which geo-location services

10

had been authorized) and a silver Nissan Maxima with temporary tags. *See* J.A. 238–239.

Geo-location services for Garrett's phone (Target Telephone 1/TT1, ending -1711) showed that it remained at the residence until a little after 9 a.m. when it started moving along a route that would lead to Interstate 40. J.A. 238. At around 10 a.m., officers realized from the geo-location services for Cole-Evans's phone (Target Telephone 2/TT2, ending -8193) that TT1 and TT2 were traveling together. J.A. 238; S.A. 14–15. At approximately 10:05 a.m., an officer conducting surveillance saw a gray Nissan Maxima with 30-day temporary tags traveling at about 95 miles per hour where I-40 and I-85 meet. J.A. 238. Officers continued physical and electronic surveillance as Garrett and Cole-Evans traveled to Greensboro, where Garrett met with his source of supply at a Bojangles restaurant. *See* J.A. 265; J.A. 246, ¶ 18; S.A. 15–16. They began their return trip home. J.A. 346, ¶ 18; *see* J.A. 265.

Slightly before 1:00 p.m., a Johnston County Sheriff's deputy pulled over the Nissan after observing multiple traffic infractions. J.A. 94; J.A. 100; J.A. 346, ¶ 18. The car smelled strongly of marijuana, prompting the deputy to conduct a search that recovered nearly 285 grams of 100% pure crystal methamphetamine and .5 gram of marijuana. J.A. 95; J.A. 100; J.A. 346–47, ¶ 18. The deputy arrested both Garrett and Cole-Evans. J.A. 95, J.A. 100; J.A. 346–47, ¶ 18.

***Counts Seven through Nine.*** About an hour after the traffic stop began, WCSO Detective Ebersole obtained a search warrant for the South Pine Street

property that Garrett and/or Cole-Evans had left shortly before the February controlled purchases. J.A. 82–95; J.A. 347, ¶ 19. Det. Ebersole's affidavit distinguished between the actions of CS1 and CS2. *See* J.A. 89, ¶ 1; J.A. 92, ¶ 15; J.A. 94, ¶ 21. However, as with other investigative materials to this point, Det. Ebersole attributed Garrett's actions (mistakenly) to McDuffie. *See* J.A. 81–95, J.A. 129, J.A. 232; *see also* J.A. 130–131.

In the bedroom Garrett shared with his girlfriend, officers found three digital scales with off-white crystal residue; in the bedroom closet, 404 grams of marijuana, 2.5 dosage units of Xanax, a .45 caliber pistol with a high-capacity magazine, a 9mm pistol, and a 10mm rifle; and in the bedroom safe, 28 grams of crystal methamphetamine, 1.8 grams of cocaine base, and 7 dosage units of suboxone. J.A. 347, ¶ 19; *see* J.A. 100–101.

Investigators spoke with Garrett after the search of his home. *See* J.A. 347, ¶¶ 19, 21. Garrett admitted that the methamphetamine found in the car was his, that all drugs and firearms found in his bedroom were his, and that only he knew the combination for the bedroom safe. J.A. 347, ¶ 21. He also asked why his girlfriend was being charged with the contraband in their bedroom if he claimed ownership of all the items. J.A. 101.

On March 23, investigators applied for and received a search warrant to search an iPhone they identified as being Garrett's. J.A. 96–105.

## Garrett's Motion to Suppress

Garrett moved to suppress all physical and testimonial evidence obtained or derived from the searches of his home and iPhone by warrants issued on March 9 and 23, 2021, respectively. *See* J.A. 70–80 (suppression motion), J.A. 82–96 (warrant for South Pine Street residence and certain cars), J.A. 97–105 (warrant for iPhone). Garrett argued that the search warrant for the residence was infirm because Det. Ebersole failed to inform the judge that Garrett was arrested on the mistaken belief that he was McDuffie and because the misidentification called into question "all statements identifying the narcotics seller." *See* J.A. 72–75. The phone warrant, he argued, was fruit of the unconstitutional search of the home and otherwise infirm because it omitted information about McDuffie. *See* J.A. 75–79.

In his motion to suppress, Garrett recognized that "records produced in discovery indicate that law enforcement was contemporaneously tracking his, or Gregory McDuffie's, GPS location" by March 9, 2021. *See* J.A. 71 & n.1. Garrett did not challenge the Garrett PRTT.

In opposing Garrett's suppression motion, government counsel explained that it was only after Garrett's arrest with Cole-Evans on March 9th that investigators realized the person they believed to be McDuffie was actually Garrett: in other words, *Garrett* was the black male living at the South Pine Street residence, driving the silver Volvo, using the -1711 phone number (TT1), appearing on the camera during the February 24th controlled purchase, and selling crystal methamphetamine. J.A. 135–136; *see supra* pages 7–8. When

13

Det. Ebersole applied for the search warrant, however, she had not yet learned of the mistaken identification. *See* J.A. 136. This honest mistake, from the government's perspective, did not undermine the probable cause developed in the search warrants or require suppression. *See* J.A. 130–147.

The government's response in opposition generically referred to "a" CS or "the" CS; it did not distinguish between actions taken by CS1 and CS2. *See* J.A. 131–137.

### Cole-Evans's Motion to Suppress

In January 2022, Cole-Evans filed a motion to suppress all information derived from the Cole-Evans PRTT because the application did not disclose that a "highly suggestive method" was used to have the CI "positively identify" Cole-Evans or that another person was associated with the phone number. *See* J.A. 107–112. According to Cole-Evans, the purported misrepresentations and/or material omissions required a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). J.A. 109–112. Cole-Evans also argued that the "alleged smell of marijuana" did not provide the officer probable cause to search the Nissan on March 9, 2021. J.A. 112–115.

In response, the government argued—incorrectly—that the Cole-Evans PRTT did not implicate the Fourth Amendment because it did not include location data. J.A. 153–154, J.A. 293. The government then cited Fourth Circuit decisions supporting the proposition that the odor of marijuana alone

14

provides probable cause to believe that evidence of marijuana possession is present. J.A. 154–155.

As with the response in opposition to Garrett's motion to suppress, J.A. 131–137, the government's response to Cole-Evans's motion generically referred to "a" CS or "the" CS; it did not distinguish between actions taken by CS1 and CS2, *see* J.A. 149–153.

### Government's Disclosure of Additional Discovery Materials and Court's Rulings on the Suppression Motions

Both motions to suppress were fully briefed by February 1, 2022. *See* J.A. 130–147, J.A. 149–155; J.A. 169–175. On February 2, 2022, the government provided Garrett and Cole-Evans additional discovery materials. *See* J.A. 286.

On February 22, 2022, the court denied Cole-Evans's motion to suppress, explaining that pen registers do not implicate the Fourth Amendment and that the odor of marijuana provided the officer probable cause to search the car. J.A. 213–216.

On February 25, 2022, Garrett orally moved to continue the hearing scheduled that day for his suppression motion. J.A. 15. The court granted the motion and rescheduled Garrett's suppression hearing and arraignment for its March 2022 term of court. J.A. 15.

On March 15, 2022, Garrett moved to withdraw his motion to suppress, explaining that he "intends to enter a guilty plea pursuant to a Memorandum of Plea Agreement at his arraignment currently scheduled for tomorrow,

March 16, 2022." J.A. 247–248. The court granted Garrett's motion that day. J.A. 251.

### Cole-Evans Pro Se Motion for New Counsel

On March 14, 2022, the court received Cole-Evans's pro se motion for new court-appointed counsel based on complaints with existing counsel's performance. *See* J.A. 217–227. Cole-Evans also raised additional concerns about misstatements in/omissions from the Cole-Evans PRTT application: first, that it did not alert the judicial official that there were two different CSs; second, that it did not disclose that CS2 was paid.[3] J.A. 217–227; *see* J.A. 108–112 (suppression motion raising concerns about identification method and other person associated with the phone number). Cole-Evans attached to his request letters from counsel and discovery materials. J.A. 228–241. On March 15, 2022, the court granted his request for new counsel. J.A. 250.

### Garrett Pleads Guilty with a Plea Agreement

On March 16, 2022, the government filed a notice of intent to seek enhanced penalties under 21 U.S.C. § 851. J.A. 254–255; *see* J.A. 329 (superseding indictment alleging prior conviction).

---

[3] Undersigned counsel cannot discern from the district court record whether CS2 was, in fact, paid for the controlled purchase made on February 16, 2021. The government acknowledges that Cole-Evans proffered handwritten notes included in the February 2022 discovery disclosure that suggest CS2 may have received $200. J.A. 234; *see* J.A. 224, J.A. 286.

As forecasted in his motion to withdraw his suppression motion, J.A. 247–248, Garrett reached a plea agreement with the government wherein he promised to plead guilty to Counts One, Two, and Five, and

> To waive knowingly and expressly the right to appeal the conviction and whatever sentence is imposed on any ground, including any appeal pursuant to 18 U.S.C. § 3742, and further to waive any right to contest the conviction or the sentence in any post-conviction proceeding, including any proceeding under 28 U.S.C. § 2255, excepting an appeal or motion based upon grounds of ineffective assistance of counsel or prosecutorial misconduct not known to the Defendant at the time of the Defendant's guilty plea. The foregoing appeal waiver does not constitute or trigger a waiver by the United States of any of its rights to appeal provided by law.

J.A. 332–333. In exchange for this and other promises from Garrett, the government agreed that it would dismiss at sentencing the remaining charges against him, including one that carried a five-year consecutive mandatory minimum, and that he should receive the maximum adjustment for accepting responsibility. J.A. 339; J.A. 356, ¶ 78.

On March 16, 2022, the district court held Garrett's guilty plea proceeding pursuant to Rule 11 of the Federal Rules of Criminal Procedure; accepted his guilty pleas to Counts One, Two, and Five; and approved his plea agreement with the government. J.A. 257–267. During the hearing, Garrett represented he was satisfied with his attorney's work, understood his trial rights and the consequences of pleading guilty, and understood the charges against him and the associated penalties. J.A. 259–261. Garrett acknowledged that he was

17

voluntarily entering into a plea agreement with the government and that an important part of the plea agreement was that he waived his right to appeal. J.A. 261–262.

In presenting the factual basis for Garrett's guilty plea to the court, government counsel noted that Count Two "was separate from all the other offenses in this" and related to Garrett's admitted possession of a .22 caliber handgun in October 2020. J.A. 263. The remaining offenses related to Garrett's methamphetamine dealing in 2021, including the drug-trafficking conspiracy (Count One) and Garrett's sale of 50 grams or more of methamphetamine to a CS on February 24, 2021 (Count Five). J.A. 263–265; *see* J.A. 326, J.A. 328.

### Garrett's Sentencing Proceedings

Garrett's advisory guidelines range of 262 to 327 months' imprisonment was driven by his status as a career offender and reflected the full reduction for acceptance of responsibility, as stipulated in the plea agreement. J.A. 351, ¶ 38; J.A. 356, ¶¶ 71–77; J.A. 270, J.A. 340, J.A. 360. Because of the § 851 notice, his mandatory minimum sentence on Counts One and Five was 180 months' imprisonment. J.A. 341–342; J.A. 356, ¶ 76.

At sentencing, defense counsel argued that a 180-month sentence was sufficient to accomplish the purposes of sentencing given Garrett's age (28) and his desire to be released from custody before his infant son graduates high school. J.A. 270–271, J.A. 343. Defense counsel noted that Garrett would

18

benefit from substance abuse treatment and educational/vocational training while in custody.  J.A. 271.

Government counsel asked for a within-guidelines sentence.  J.A. 271–272.  Government counsel highlighted Garrett's 15 prior drug felonies, his convictions for robbery and assault, his prison infractions for gang activity and assault, and his quick return to criminal conduct after being released from state custody.  J.A. 271–272; *see* J.A. 348–350, ¶¶ 27–34; J.A. 346, ¶¶ 16–17.

The court asked the probation officer what Garrett's non-career offender guidelines range would be.  J.A. 272.  Upon learning from the probation officer that it would be 210 to 262 months, the court responded: "Wow.  So with or without the career offender, guideline career offender, he's still up there in the 200's?"  J.A. 273.  The court then sentenced Garrett to concurrent sentences of 240 months' imprisonment on Counts One and Five and 120 months' imprisonment on Count Two.  J.A. 273.

### Cole-Evans's Motion to Reconsider

In August 2022, Cole-Evans asked the court to reconsider his motion to suppress and request for a *Franks* hearing.  J.A. 285–291.  He noted that discovery produced on February 2, 2022 (and Bates Numbered 851–1626) "unequivocally shows that police had in fact tracked [his] real-time physical movements" with the Cole-Evans PRTT.  J.A. 285–286.  Cole-Evans also argued that Det. Massey intentionally or recklessly misled the judicial official who issued the Cole-Evans PRTT by representing there was one CS when

there were actually two CSs, using CS1's established credibility/history for CS2, and omitting that CS2 was a paid informant.  J.A. 288–290.

In its written response, the government acknowledged that reconsideration was appropriate insofar as its earlier argument was "premised on the erroneous assumption that the PRTT order did not include location data."  J.A. 293, J.A. 297–298.  The government then outlined why Cole-Evans failed to make the requisite showing for a *Franks* hearing.  J.A. 298–307.  The government challenged Cole-Evans's claim "that he first learned that the investigation involved two confidential sources from a discovery production after the motion to suppress was briefed" by providing a non-exhaustive list of times in earlier-produced discovery where two CSs were clearly discussed.  J.A. 301–302.  The government further argued that Cole-Evans had not produced evidence that Det. Massey omitted facts to intentionally mislead the judicial officer, J.A. 302–304, or that probable cause was lacking but for the omissions, J.A. 305–307.

The court held a hearing on the motion to reconsider.  S.A. 1–23.  During the hearing, government counsel explained that on March 9th, the day Cole-Evans and Garrett were arrested, law enforcement were tracking *Garrett* through the earlier obtained Garrett PRTT when they *eventually* realized that Cole-Evans and Garrett were traveling together.  *See* S.A. 14–16.

The court ultimately granted the motion to reconsider and found that Cole-Evans satisfied his burden to obtain a *Franks* hearing.  J.A. 309–313.  The court noted that Det. Massey's affidavit refers to one CS when "latent" discov-

20

ery showed there were two, did not include statements as to either CS's credibility, and did not include information proffered by Cole-Evans that CS2 was paid and did not have an established track record.   J.A. 311.   The court explained that

> the affidavit's failure to distinguish the two confidential informants leads the reader to believe that the confidential source who assisted law enforcement in securing a pen register for a telephone number being used by McDuffie [Garrett] is the same confidential source being relied upon by law enforcement to seek a pen register for a telephone number associated with [Cole-Evans], thereby imputing the credibility of the first confidential source to the second.

J.A. 311–312.   The court reasoned that "the omission of the fact that there were two separate confidential sources utilized *appears to be* an omission made at a minimum with reckless disregard for the truth."[4]   J.A. 312 (emphasis added).   The court scheduled a *Franks* hearing for its September 2022 term of court.   J.A. 313.

There was never a *Franks* hearing because the parties sought a continuance to explore a negotiated resolution, and in October 2022, the government dismissed with prejudice the three charges against Cole-Evans.   J.A. 314–318.

---

[4]   While the district court found that Cole-Evans had made a preliminary showing to have a *Franks* hearing, it never resolved whether Det. Massey omitted the information with reckless disregard for the truth or with purposes to mislead.   Nor did the district court make any finding as to whether CS2 was paid.   As a court of review, this Court should not make such factual findings in the first instance.

## SUMMARY OF ARGUMENT

1.     Garrett has not met his burden, on plain-error review, to demonstrate that his guilty pleas to Counts One, Two, and Five were unknowing or involuntary based upon shortcomings in the Cole-Evans PRTT.

First, Garrett has not demonstrated that the Garrett PRTT included *any* misstatements or material omissions.  Because this issue was not raised below, the Garrett PRTT is not part of the record; however, materials in the record show that it was obtained based on the information gathered through the first controlled purchase, which was made by CS1.  Because the Garrett PRTT pre-dated the second controlled purchase, there was no reason for it to discuss CS2 at all.

Second, Garrett knew when he filed his motion to suppress that "records produced in discovery indicate that law enforcement was contemporaneously tracking his . . . GPS location."  J.A. 71 n.1.  Garrett could have challenged the GPS tracking of his phone, but he didn't.  Furthermore, Garrett lacks standing to challenge the Cole-Evans PRTT that is the focus of his arguments.

Third, Garrett overstates the role the Cole-Evans PRTT had in the case against him.  Count Two—Garrett's admitted possession of a firearm on October 31, 2020—predates both PRTTs and was not affected by either.  Neither Cole-Evans nor his phone were involved in Count Five, which related to Garrett personally selling crystal methamphetamine to CS2 on February 24, 2021.  With respect to the March 9th arrest of Garrett and Cole-Evans as they returned from a visit with Garrett's supplier, investigators were tracking *Garrett's*

movements with the Garrett PRTT and physical surveillance when they realized that Cole-Evans was traveling with him. The search warrant for Garrett's home distinguished between the actions taken by CS1 and CS2, and when confronted with the contraband found in the car and his residence on March 9, 2021, Garrett admitted that it was all his. The evidence of Garrett's involvement in the Count One conspiracy was overwhelming and existed independent of any information obtained with the Cole-Evans PRTT.

The government acknowledges that the Cole-Evans PRTT (and its own responses to the motions to suppress) failed to differentiate between CS1 and CS2 and omitted information relating to whether CS2 was paid. That said, Garrett's situation is nothing like the extraordinary circumstances in *United States v. Fisher*, 711 F.3d 460 (4th Cir. 2013), where Fisher's guilty plea was set aside as involuntary because an investigator who was later criminally prosecuted purposefully lied in the search warrant that led to the discovery of the critical evidence against Fisher. Considering the totality of the circumstances of this case, and the rigorous plain-error standard that Garrett must meet, he has not demonstrated that issues with the Cole-Evans PRTT rendered his guilty plea unknowing and involuntary.

Nor has Garrett demonstrated that the timing of the discovery disclosures on February 2, 2022, rendered his guilty pleas involuntary, a claim that is reviewed for plain error. Garrett acknowledges that the government is not required to disclose material impeachment evidence prior to entering into a plea agreement and that it "is an open question" whether *Brady v. Maryland* extends

to a defendant who is pleading guilty.  Brief at 22–25.  Thus, even assuming that the government withheld *exculpatory* evidence (which it did not), Garrett has not demonstrated that there was "obvious" error that is "clear under current law."

2.     In his plea agreement, Garrett agreed "to waive knowingly and expressly the right to appeal the conviction and whatever sentence is imposed on any ground," with exceptions for appeals "based upon grounds of ineffective assistance of counsel or prosecutorial misconduct not known to the Defendant at the time of the Defendant's guilty plea."  J.A. 332.  Garrett's claim that the court committed procedural sentencing error by not explaining why it rejected his sentencing arguments is within the scope of this wavier.

In any event, there was little for the court to say in response to Garrett's assertion that the mandatory minimum 180-month sentence was appropriate because he was 28 years' old and hoped to be home before his child was grown.  This is a straight-forward argument that the court has seen in various iterations over the years.  The court heard it and then reasoned that a 240-month below-guidelines sentence was appropriate, given Garrett's status as a career offender and his significant guidelines range without the career-offender enhancement.  There is no reason to believe that discussion of Garrett's age or fatherhood would have caused the court to vary further.

# ARGUMENT

## I.   Garrett has not shown that his guilty pleas were unknowing and involuntary.

### A.   Standard of Review.

Because Garrett did not attempt to withdraw his guilty plea in the district court, this Court reviews his plea challenges for plain error.  Brief at 12; *United States v. Lockhart*, 947 F.3d 187, 191 (2020) (en banc) (citing *United States v. McCoy*, 895 F.3d 358, 364 (4th Cir. 2018)); Fed. R. Crim. P. 52(b). To succeed under plain-error review, Garrett must show that: (1) an error occurred; (2) the error was plain; and (3) the error affected his substantial rights.  *Lockhart*, 947 F.3d at 191 (citing *United States v. Olano*, 507 U.S. 725, 732 (1993)).  Under the third prong, Garrett "bears the burden to show 'a reasonable probability that, but for the error, he would not have entered the plea.'" *Id.* at 192 (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004)).  Under the fourth prong of plain-error review, this Court "retain[s] the discretion to correct such an error but will do so 'only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.'"  *Id.* at 191 (quoting *United States v. Massenburg*, 564 F.3d 337, 343 (4th Cir. 2009)).   "Meeting all four prongs is difficult, 'as it should be.'"  *Puckett v. United States*, 556 U.S. 129, 135 (2009) (quoting *Dominguez Benitez*, 542 U.S. at 83 n.9).

**B.      Discussion of Issue.**

**1.      A guilty plea entered with knowledge of its direct consequences will be set aside as involuntary only in narrow circumstances.**

"The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). A guilty plea is valid if the defendant voluntary, knowingly, and intelligent pleads guilty "with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970). For this reason, a guilty plea

> entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, *must stand unless* induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).

*Id.* at 755 (emphasis added; quotation marks and citation omitted). Accordingly, where a defendant is fully aware of the direct consequences of his plea, it may be set aside as involuntary if he shows "that (1) 'some egregiously impermissible conduct (say, threats, *blatant misrepresentations*, or untoward blandishments by government agents) antedated the entry of his plea' and (2) 'the misconduct influenced his decision to plead guilty or, put another way, that it

26

was material to that choice.'" *United States v. Fisher*, 711 F.3d 460, 465 (4th Cir. 2013) (quoting *Ferrara v. United States*, 456 F.3d 278, 290 (1st Cir. 2006)).

"Often the decision to plead guilty is heavily influenced by the defendant's appraisal of the prosecution's case against him and the apparent likelihood of securing leniency should a guilty plea be offered and accepted." *Brady v. United States*, 397 U.S. at 756. The Constitution permits a court to accept a guilty plea "despite various forms of misapprehension under which a defendant might labor." *United States v. Ruiz*, 536 U.S. 622, 630 (2002). But where the "Defendant's misapprehension stems from an affirmative government misrepresentation that 'strikes at the entirety of the prosecution as a whole,'" this Court has set aside a guilty plea as involuntary. *Fisher*, 711 F.3d at 466 (citation omitted); *accord id.* at 466–70. Specifically, in *United States v. Fisher*, this Court held that an officer's "affirmative misrepresentation, which informed the defendant's decision to plead guilty and tinged the entire proceeding, rendered the defendant's plea involuntary and violated his due process rights." 711 F.3d at 462.

Cortez Fisher pleaded guilty to possession of a firearm by a felon with a plea agreement that provided for dismissal of a drug-distribution charge. *See id.* at 463. The evidence against Fisher—cocaine base and a loaded handgun—was found through a search warrant for his home and car. *Id.* Without this evidence, "there likely would have been no prosecution at all." *Id.* at 467. After Fisher's conviction was final, it became apparent that the evidence "was ob-

27

tained under a search warrant issued solely on the basis of an untruthful law enforcement affidavit." *Id.* at 463, 467.

A year after Fisher pleaded guilty, the affiant for that search warrant, Brian Lunsford, "was charged with various fraud and theft offenses related to his duties as a DEA officer, including falsely attributing information to a confidential informant with whom he was splitting reward money." *Id.* Lunsford pleaded guilty to several offenses and admitted to having defrauded the justice system in connection with his duties as an officer. *Id.* at 462–63. Regarding Fisher's case specifically, "Lunsford admitted to the Federal Bureau of Investigation that the confidential informant he identified in his affidavit 'had no connection to the case' and that another individual was 'the real informant.'" *Id.* at 463.

The Court found that Fisher successfully established impermissible conduct: "an officer's deliberate lie that led to the warrant that led to the discovery of the evidence against him." *Id.* at 467. The Court then agreed with Fisher that "a reasonable defendant standing in his shoes likely would have altered his decision to plead guilty, had he known about Lunsford's misconduct." *See id.* at 467–69. Among other things, Fisher's attorney testified that his approach to the case would have been entirely different had he known about Lunsford's felonious behavior: he would have explored dismissal and more favorable plea options, moved to suppress and for a *Franks* hearing if a negotiated resolution could not be reached, advised Fisher that a key consideration in pleading guilty would be Lunsford's credibility at trial, and likely would have obtained a sen-

tence below the statutory maximum. *See id.* at 467–68. After considering all the circumstances in Fisher's case, this Court found that he "was 'deceived into making the plea, and the deception prevents his act from being a true act of volition.'" *Id.* at 469 (quoting *Lassiter v. Turner*, 423 F.2d 897, 900 (4th Cir. 1970)).

As of May 23, 2023, WestLaw reported 49 Fourth Circuit cases citing *Fisher*. Undersigned counsel has reviewed these cases, and not one involved setting aside a guilty plea as involuntary based on egregiously impermissible government misconduct. *Fisher* presented "highly uncommon circumstances in which gross police misconduct goes to the heart of the prosecution's case." 711 F.3d at 466. This case is not like *Fisher*.

### 2. Garrett has not demonstrated egregiously impermissible government conduct as required by *Fisher*.

The burden on plain-error review is with the defendant to establish impermissible conduct. Fisher, in his § 2255 proceedings, established through testimony and other evidence that Lunsford knowingly and deliberately offered false testimony in his sworn search warrant affidavit for Fisher's home and car. *See Fisher*, 711 F.3d 466–67. Here, Garrett has not demonstrated that the PRTT for his phone includes any misstatements or omits any material information, much less that any misstatement/omission was deliberate and intended to deceive. Indeed, the Garrett PRTT is not part of the district court record.

Materials that are in the record, however, indicate that it would not have suffered from the same problems as the Cole-Evans PRTT. CS1 made the first

controlled purchase from Garrett on February 3, 2021. J.A 89–91. It was "[b]ased upon the information gathered during this purchase" that investigators applied for and obtained a PRTT for the phone number ending -1711 (Target Telephone 1/TT1) that was used to arrange the deal. J.A. 117; *see* J.A. 89, J.A. 238. In considering Cole-Evans's motion to reconsider, the district court recognized this difference between the two PRTTs. *See* J.A. 311–312. It explained that Det. Massey's failure to distinguish between the two CSs in the Cole-Evans PRTT "leads the reader to believe that *the confidential source who assisted law enforcement in securing a pen register for a telephone being used by McDuffie* [Garrett] is the same confidential source being relied upon" to seek the Cole-Evans PRTT. J.A. 311–312 (emphasis added). Because only CS1 was relied upon to obtain the Garrett PRTT, there was no reason for it to discuss CS2. As a result, Garrett has not shown that there were any misrepresentations or material omissions in the Garrett PRTT that authorized the tracking of his phone.

At the time Garrett filed his motion to suppress, he knew that "records produced in discovery indicate that law enforcement was contemporaneously tracking his . . . GPS location." J.A. 71 n.1. The discovery materials then available to Garrett also clearly reflected the participation of different CSs during the investigation. *See* J.A. 301–302; *see also* J.A. 286 (noting that the February 2022 discovery included documents Bates Numbered 851 and higher). Nothing prevented Garrett from challenging the GPS tracking of *his* phone on whatever grounds he deemed appropriate. But he would not have had standing to challenge the Cole-Evans PRTT directly, given Garrett's lack a constitution-

ally protected privacy interest in the movements of his adult cousin.[5]   The search warrant for Garrett's home and car—which Garrett did challenge in his motion to suppress—distinguished between the actions of the two CSs.   J.A. 89–93, ¶¶ 1, 15, 21; J.A. 70–76.   Garrett simply has not shown that any authorization to search his phone, house, or car suffered from the shortcomings present in the Cole-Evans PRTT.

Highlighting the issues with the Cole-Evans PRTT or conclusorily accusing the government of "attempt[ing] to mislead the district court below[] regarding the credibility of the confidential source," *see* Brief 13–15, does not satisfy *Fisher*'s first prong.   In *Fisher*, it was uncontested that Lunsford intentionally lied in the search warrant affidavit.   711 F.3d at 467–70.   Garrett has not established that the Cole-Evans PRTT included misrepresentations or omitted material information *in order to* deliberately deceive the reviewing judicial official.   *See* J.A. 302–305 (highlighting the absence of evidence as to Det. Massey's intent); S.A. 17–20 (same).   The court's factual finding as to this issue was a narrow one, given that it was evaluating Cole-Evans's preliminary show-

---

[5]   A "defendant's Fourth Amendment rights are violated only when the challenged conduct invaded *his* legitimate expectation of privacy rather than that of a third party."   *United States v. Payner*, 447 U.S. 727, 731 (1980) (citing cases); *see Carpenter v. United States*, 138 S. Ct. 2206, 2216 (2018) (addressing "how to apply the Fourth Amendment to a new phenomenon: the ability to chronicle a person's past movements through the record of *his* cell phone signals") (emphasis added).   Nothing in the record indicates that Garrett would have had a protected interest in his cousin's telephone or in what tracking the movements of that phone would reveal.

ing to obtain a *Franks* hearing. *See* J.A. 311–312. It found: "[T]he omission of the fact that there were two separate confidential sources utilized *appears to be* an omission made at a minimum with reckless disregard for the truth." J.A. 312 (emphasis added). The government disagrees that is sufficient to justify a *Franks* hearing, which requires "a substantial preliminary showing that a false statement *knowingly and intentionally*, or with *reckless disregard for the truth*, was included by the affiant in the warrant affidavit." *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978) (emphasis added). Regardless, that Cole-Evans persuaded the district court to hold a *Franks* hearing to explore potential misconduct does not establish that there was, in fact, misconduct. The court never found that Det. Massey acted with reckless disregard for the truth, much less acted with the criminal intent displayed by Lunsford in *Fisher*. The *Fisher* decision emphasized the extreme egregiousness of Lunsford's intent and his purposeful steps to corrupt the judicial system. There is no evidence of that sort of gross misconduct here.

Relatedly, the record is silent as to why government counsel's response to the motions to suppress did not distinguish between the two CSs and as to why certain discovery materials were disclosed in February 2022. Having failed to raise these concerns in a timely manner to the district court, the plain-error standard prevents Garrett from using the absence of any such explanation as proof of his theory that the government "attempted to mislead the district court below." *See* Brief at 13.

32

Garrett has not satisfied the first step in the *Fisher* analysis, so there is no need to proceed to the second step.

### 3. Garrett has not shown that shortcomings in the Cole-Evans PRTT induced his guilty plea.

If a defendant establishes impermissible government conduct, he then bears the burden of "show[ing] that the misconduct induced him to plead guilty." *Fisher*, 711 F.3d at 467. Thus, Garrett must demonstrate "a reasonable probability that, but for the misconduct, he would not have pleaded guilty and would have insisted on going to trial." *Id.* The standard is an objective one that asks whether "a reasonable defendant standing in his shoes likely would have altered his decision to plead guilty, had he known about [the] misconduct." *Id.* A reasonable defendant in Garrett's shoes would not have been induced to plead guilty based on shortcomings in a PRTT that he lacks standing to challenge and that played a minimal role in the case against him.

The conduct underlying Count Two preceded the entirety of the drug investigation. On October 31, 2020, Garrett was caught with a firearm that he admitted was his "for protection" despite his status as a convicted felon. J.A. 346, ¶ 16; J.A. 232. During the guilty plea proceeding, government counsel highlighted that Count Two "was separate from all the other offenses in this," referring to the charges flowing from the 2021 drug investigation. *See* J.A. 263–265. Garrett has not shown that flaws in the Cole-Evans PRTT induced him to plead guilty to criminal conduct he admitted months before its issuance.

As for Count Five, nothing in the record suggests that Cole-Evans or his telephone were involved in Garrett's distribution of 110.44 grams of 100% pure crystal methamphetamine to CS2 on February 24, 2021. *See* J.A. 346, ¶ 17; J.A. 94; *see also* J.A. 134 (including an image of Garrett captured by the audio/video recording device CS2 had during the transaction). It is unclear how any shortcomings in the Cole-Evans PRTT could have affected the government's evidence (or Garrett's assessment of the evidence) on Count Five.

By pleading guilty to Count One, Garrett admitted to conspiring to distribute and possess with intent to distribute 50 grams or more of methamphetamine. J.A. 260–262, J.A. 326, J.A. 335. The evidence supporting this charge encompassed Garrett's methamphetamine-distribution activities more broadly. But even so, Garrett has not shown what evidence *against him* was derived from the Cole-Evans PRTT or how shortcomings in the Cole-Evans PRTT affected *his* decision to plead guilty.

Referring to the Cole-Evans PRTT, Garrett boldly asserts: "Without this real-time cell phone tracking, the government would not have known the location of the vehicle to effectuate the traffic stop on March 9, 2021, which started this whole case." Brief at 6. But investigators had been building a drug case against Garrett since learning in January 2021 from CS1 of Garrett's drug activities. J.A. 89. They had been monitoring the movements of Garrett's cellular telephone since the February 3, 2021, controlled purchase by CS1. *See* J.A. 71 n.1, J.A. 89–91, J.A. 117, J.A. 238–239; S.A. 14–16. On March 9, investigators were using the Garrett PRTT and a physical surveillance team to track

34

Garrett as he travelled to meet his source of supply when they realized from the Cole-Evans PRTT that the two men were traveling together. *See* J.A. 238–239; S.A. 15–16. The investigative team maintained electronic and physical surveillance on the Nissan Garrett and Cole-Evans were in throughout the trip, and a deputy eventually pulled the car over after observing multiple traffic infractions. *See* J.A. 94–95, J.A. 238–239 J.A. 346–347, ¶ 18; S.A. 15–16. From there, the smell of marijuana provided probable cause to search the car, which led to finding the crystal methamphetamine Garrett had just received from his supplier. J.A. 94–95, J.A. 346–347, ¶ 8. Furthermore, when confronted by investigators on March 9, Garrett admitted that the drugs the methamphetamine found in the car was his, that all drugs and firearms found in his bedroom were his, and that only he knew the combination for the bedroom safe. J.A. 347, ¶ 21. He also asked why his girlfriend was being charged with the contraband in their bedroom if he claimed ownership of all the items. J.A. 101. The evidence against Garrett was compelling, and the case against him was not meaningfully furthered by any location information secured through the Cole-Evans PRTT.

Against this backdrop, Garrett chose to plead guilty to Counts One, Two, and Five in exchange for concessions from the government, including the dismissal of a § 924(c) charge and an agreement that he should receive the full reduction for acceptance of responsibility. Given that about ten months had elapsed since the Garrett was indicted and that the government had responded to his motion to suppress, it was not a foregone conclusion that the govern-

ment would view his decision to plea as timely and allowing the efficient allocation of government resources. *See* U.S.S.G. § 3E1.1(b). Garrett's decision to plead guilty with a favorable plea agreement represented a voluntary and intelligent choice among the alternative courses of action available to him.

The other circumstances that Garrett marshals to support his argument are largely speculative. *See* Brief at 19–20. For example, while the February 2022 discovery disclosure consisted of hundreds of pages, J.A. 286, one page of handwritten notes does not mean that the hundreds of pages "were not easily decipherable," *see* Brief at 19 (citing J.A. 234). Had Garrett needed more time to review the February 2022 disclosures, he could have brought the late disclosure to the district court's attention and asked for additional time. That Cole-Evans did not succeed in his suppression motion—which challenged the Cole-Evans PRTT and whether the odor of marijuana can provide probable cause to search a car—provides no insight into whether Garrett may have been successful in his challenges to warrants for his home, car, and iPhone issued in March 2022. *See* Brief at 19; *compare* J.A. 70–80, *with* J.A. 106–115. Similarly, Cole-Evans's success in obtaining a *Franks* hearing bears no relation to the issues Garrett was pursuing in his motion to dismiss. *See* Brief at 20 (claiming that, but for the government's misrepresentations "Garrett would have continued to pursue his suppression motion"). The totality of the circumstance here are not like those presented in *Fisher*.

**4.    Garrett has not shown that that timing of the February 2, 2022, disclosures rendered his guilty plea involuntary.**

It is unclear from the record what materials were included in the February 2022 disclosures, but at least some of them could have been provided in earlier government disclosures.  *See* J.A. 286 (referring to materials Bates Numbered 851–1626); *see, e.g.*, J.A. 232 (a DEA report from March 2021).  It is also unclear why these materials were not included in earlier discovery productions, something that government counsel may have been able to explain if a timely objection had been raised in the district court.  But Garrett did not file any motion related to the timing or content of this discovery disclosure, nor did he ever suggest that it presented a problem of constitutional dimensions.  Accordingly, his argument under *Brady v. Maryland*, 373 U.S. 83 (1963), Brief at 21–27, is reviewed for plain error under Federal Rule of Criminal Procedure 52(b).

It is well established that a "court of appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law."  *United States v. Olano*, 507 U.S. 725, 734 (1993).  As Garrett recognizes, "[w]hether the government's failure to produce exculpatory evidence can render a plea involuntary is *an open question, both at the Supreme Court and before this Court*."  Brief at 22 (emphasis added).  He recognizes that the circuits to have addressed this question are divided and urges this Court to join those that have decided the issue in his favor.  *See* Brief at 23–24.  By his own admission, Garrett is asking this Court to make new law by extending *Brady v. Maryland* to the guilty plea

context. This alone shows that he cannot demonstrate a clear and obvious violation of current law.

After all, this Court has explained: "The *Brady* right . . . is *a trial* right. It requires a prosecutor to disclose evidence favorable to the defense if the evidence is material to either guilt or punishment, and exists to preserve the fairness of a trial verdict and to minimize the chance that an innocent person would be found guilty." *United States v. Moussaoui*, 591 F.3d 263, 285 (4th Cir. 2010) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). Where a defendant has admitted his guilt by pleading guilty, "those concerns are almost completely eliminated." *Moussaoui*, 591 F.3d at 285 (collecting cases). The Supreme Court has yet to address whether the *Brady* right to exculpatory information extends to the guilty plea context; however, this Court has suggested that it does not. *Jones v. Cooper*, 311 F.3d 306, 315 n.5 (4th Cir. 2002) ("To the extent that appellant contends that he would not have pled guilty had he been provided the information held by the jailor, this claim is foreclosed by…*Ruiz*.[6]"); *see also Moussaoui*, 591 F.3d at 286 (declining to decide whether "the prosecution's failure to disclose material exculpatory evidence at the plea stage could result in an unknowing plea in certain narrow circumstances"). Garrett swore under oath that he was, in fact, guilty of Counts One, Two, and Five. J.A. 258–262.

---

[6]   *United States v. Ruiz*, 536 U.S. 622, 625 (2002) (holding that the Constitution does not require "federal prosecutors, before entering into a binding plea agreement with a criminal defendant, to disclose 'impeachment information relating to any informants or other witnesses'")

He should not be allowed to use the government's disclosure of materials on February 2, 2022—about *six weeks* before his guilty plea on March 16, 2022—to invalidate his knowing and voluntary guilty pleas.

Even if *Brady v. Maryland* were to extend to the guilty plea context, Garrett has not shown a *Brady* violation or prejudice. Shortcomings in the Cole-Evans PRTT affidavit may provide fodder to cross-examine Det. Massey and CS2; however, omitting that there were two CSs or that CS2 may have been paid is not *exculpatory*. If anything, two different CSs being able to easily purchase crystal methamphetamine from Garrett is *inculpatory*. Garrett also knew from the government's June 2021 discovery disclosures that there were different CSs used during the investigation. *See* J.A. 301–302. Finally, for all the reasons noted above, Garrett cannot show that flaws with the Cole-Evans PRTT affected his decision to plead guilty.

### 5. Garrett and Cole-Evans were not similarly situated.

Garrett's opening brief often juxtaposes the disposition of his case and Cole-Evans's, implying that it is somehow unfair that he is in prison while the three charges against Cole-Evans were dismissed. *See, e.g*, Brief at 1–2, 25. The preceding discussion has highlighted the strength of the evidence against Garrett and the minimal impact of the Cole-Evans PRTT in the case against him. The men were not similarly situated, in large part because they were not similarly culpable. After being convicted of 15 drug-related felonies, Garrett armed himself in October 2020, became the focus of a drug investigation in

January 2021, and was exposed as an armed methamphetamine distributor by March 2021.  It was Garrett whom the CSs called to buy drugs, and it was Garrett who had a supplier capable of providing ten ounces of pure crystal meth on short notice.  Cole-Evans came to the investigators' attention because Garrett had him make one delivery and because he accompanied Garrett on a road trip to meet his supplier.  While the record does not reveal the government's reasoning as to why it dismissed the three charges against Cole-Evans, *see* J.A. 317, we respectfully suggest that the government's assessment was informed by the vastly different levels of culpability and whether it made sense under the circumstances to compromise CS2's identity in a *Franks* hearing for Cole-Evans.

## II.    Garrett waived the right to appeal his sentence.

### A.    Standard of Review.

The Court reviews de novo whether a defendant waived his appeal rights. *United States v. Boutcher*, 998 F.3d 603, 608 (4th Cir. 2021).

### B.    Discussion of Issue.

Garrett's appeal of his sentence should be dismissed because he waived any right to bring it.  Garrett agreed "to waive knowingly and expressly the right to appeal the conviction and whatever sentence is imposed *on any ground*," with exceptions only for appeals "based upon grounds of ineffective assistance of counsel or prosecutorial misconduct not known to the Defendant at the time of the Defendant's guilty plea."  J.A. 332 (emphasis added).  Nevertheless,

Garrett argues that his sentence is procedurally unreasonable because the "court did not provide any explanation for rejecting his arguments for a reduced sentence." Brief at 3, 27–30. This argument falls squarely within the scope of his appellate waiver.

This Court will enforce an appellate waiver "if the waiver is valid and the issue sought to be appealed falls within the scope of the waiver." *United States v. Cohen*, 459 F.3d 490, 494 (4th Cir. 2006). "A waiver is valid if 'the defendant knowingly and intelligently agreed to waive the right to appeal.'" *United States v. Soloff*, 993 F.3d 240, 243 (4th Cir. 2021). "Generally . . . , 'if a district court questions a defendant regarding the waiver of appellate rights during the Rule 11 colloquy and the record indicates that the defendant understood the full significance of the waiver, the waiver is valid.'" *United States v. McCoy*, 895 F.3d 358, 362 (4th Cir. 2018).

That was the case here. The appellate waiver in Garrett's plea agreement is "unambiguous" and "plainly embodied in the plea agreement." *United States v. General*, 278 F.3d 389, 400 (4th Cir. 2002); J.A. 332. The court confirmed that Garrett had decided to enter into a plea agreement and that an important part of the plea agreement was that he agreed "to plead guilty to Counts One, Two and Five of the superseding indictment and waive your right to appeal." J.A. 261–262. Garrett's challenge to the procedural reasonableness of his below-guidelines sentence falls within the waiver's scope. Because the waiver is valid and this issue falls within its scope, Garrett's sentencing challenge should be dismissed. *Cohen*, 459 F.3d at 494. Moreover, there is nothing unfair about

holding Garrett to his knowing and voluntary appeal waiver, and the Court should do so here. *See United States v. Blick*, 408 F.3d 162, 168 (4th Cir. 2005) ("[A] defendant who waives his right to appeal for the purpose of obtaining concessions from the government 'may not . . . ignore his part of the bargain.'").

If the Court were to reach the merits of Garrett's sentencing challenge, reversal would be inappropriate. Garrett argued for a downward variance to his 180-month mandatory minimum based on his age and his desire to be released from custody before his infant son graduates from high school. J.A. 270–271; *see* J.A. 343; J.A. 352, ¶ 47. These arguments "weren't so complex as to require a detailed explanation." *United States v. Suggs*, No. 20-4032, 2022 WL 313845, at * 3 (4th Cir. Feb. 2, 2022) (unpublished). Indeed, they were relatively weak. At 28, Garrett was well into adulthood and seemingly undeterred by his decade-long criminal record. J.A. 343; J.A. 348–351, ¶¶ 27–34. And anyone being imprisoned on a federal offense wants to get back to his family sooner rather than later. There was little to say in response to Garrett's argument that he should receive the minimum possible sentence based on him being a father in his late 20's.

Even if the district court's failure to expressly address that Garrett was a 28-year-old father amounts to procedural error, any error was harmless because Garrett's sentence is unlikely to change on remand. *See United States v. Roberson*, No. 21-4128, 2023 WL 2064581, at *3 (4th Cir. Feb. 17, 2023) (unpublished). After recognizing that Garrett's guidelines range was "still up there

42

in the 200's" without the career offender enhancement based on his criminal record and the seriousness of the offense, the court determined that a downward variance to 240 months' imprisonment was appropriate. *See* J.A. 273–274. Like *Roberson*, "the district court's brief consideration of the § 3553 factors resulted in a favorable downward variance, despite the fact that [Garrett's] arguments for a variance were not particularly convincing." *Id.* While the court's sentencing explanation was minimal, it was sufficient in these circumstances.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully submits that the judgment of the district court should be affirmed, and Garrett's challenge to his sentence should be dismissed.

Respectfully submitted, this 24th day of May, 2023.

MICHAEL F. EASLEY, JR.
*United States Attorney*


BY:   */s/ Kristine L. Fritz*
      KRISTINE L. FRITZ
      *Assistant United States Attorney*
      150 Fayetteville Street, Suite 2100
      Raleigh, North Carolina  27601
      Telephone: 919-856-4530


JOHN L. GIBBONS
*Assistant United States Attorney*

*Of Counsel*

## **CERTIFICATE OF COMPLIANCE**

1.  Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, I hereby certify that this brief meets the page or type-volume limits of Rule 32(a) because, exclusive of the portions of the document exempted by Rule 32(f), this brief contains:

    ☐ _____ Pages *(may not exceed 30 pages for a principal brief or 15 pages for reply brief, pursuant to Rule 32(a)(7)(A))*; or

    ☒ 10,457 Words *(may not exceed 13,000 words for a principal brief or 6,500 words for reply brief, pursuant to Rule 32(a)(7)(B))*.

2.  Further, this document complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in Microsoft Word 2016 using fourteen-point *Calisto MT*, a proportional-width typeface.

*/s/ Kristine L. Fritz*
KRISTINE L. FRITZ
*Assistant United States Attorney*